**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

**SHELETHA FOSTER,**

   Plaintiff,

   v.         Civil Action No. 7:11-cv-81 (HL)

**THOMAS COUNTY, GEORGIA,**

   Defendant.

**ORDER**

   Before the Court is Defendant Thomas County, Georgia's Motion for Summary Judgment (Doc. 20). For the reasons stated below, the Motion is granted in part and denied in part.

**I. FACTUAL BACKGROUND**

   In October 2006, Plaintiff Sheletha Foster ("Plaintiff") was hired by Defendant Thomas County ("Defendant") as a communications officer for Thomas County E-911 ("E-911"). (Defendant's Statement of Material Facts ("DSMF") ¶¶ 1, 2.[1]) Since 2000, Chief Ann Powell ("Powell"), an African-American female, has been the chief director of E-911. (DSMF ¶ 3.) E-911 operates a day shift that runs from 6:00 a.m. until 6:00 p.m. and a night shift that runs from 6:00 p.m. until 6:00 a.m. (DSMF ¶ 4.) There are typically four or five

---

[1] All citations to the Defendant's Statement of Material Facts refer to those facts which have been admitted by Plaintiff, unless otherwise explicitly stated.

communications officers working on each shift, and each officer is responsible for communicating with a particular agency. (DSMF ¶¶ 5, 6.) The agencies with which E-911 works are the Thomas County Sheriff's Office, the Thomas County Police Department, emergency medical services ("EMS"), and the Thomasville and Thomas County fire departments. (DSMF ¶ 6.)

The communications officers all work in the same room. (DSMF ¶ 7.) Each communications officer works at a console that contains three computer screens. One screen shows the telephone lines that are in use, one screen shows a map of the city or county, and one screen displays the information being entered by a communications officer in regards to the calls that he or she is receiving. (DSMF ¶ 8.) Each communications officer is equipped with a headset that has a single earpiece that can be worn in the right or left ear. (DSMF ¶ 9.) Typically, communications officers working at E-911 rotate between the day and night shifts every four months. (DSMF ¶ 12.) The change from the day shift to night shift usually occurs on January 1, May 1, and September 1. (DSMF ¶ 13.)

When Plaintiff began work at E-911, she signed a document that provided that "I understand that my shifts may change as well as the personnel that I work with." (DSMF ¶ 14.) She understood that her schedule was subject to change (DSMF ¶ 15); however, for her first three years at E-911, she rotated between the day and night shifts on a regular basis every four months and came to expect that this routine would continue indefinitely (Plaintiff's Statement of Disputed Material Facts ("PSDMF"), Doc. 31, ¶ 2).

2

In December 2009, Plaintiff was working the night shift under the supervision of Brandon Waddell. (DSMF ¶ 16.) Under the typical rotation, Waddell's team was supposed to change to the day shift in January. (DSMF ¶ 18.) However, in January 2010, Waddell was demoted. (DSMF ¶ 19.) After Waddell's demotion, a number of communications officer were transferred to different shifts. (DSMF ¶ 20.) As a result of the transfers, Plaintiff was moved to a team supervised by Lt. Melanie Harper. (DSMF ¶ 23.) Harper's team was working the night shift. As a result, Plaintiff was scheduled to work the night shift for four months longer than she originally planned. On March 5, 2010, at approximately 7:00 p.m., Plaintiff was involved in an incident ("the Incident") with Patrick Slaughter, a fellow Thomas County communications officer. (DSMF ¶ 30.) On the night of the Incident, Plaintiff was working at E-911 with Slaughter, Melanie Harper, and Natasha Davis. (DSMF ¶ 31.) Plaintiff was assigned to calls and radio traffic for the Sheriff's Office, Slaughter was handling calls for fire, Davis was taking EMS-related calls, and Harper was working calls related to the Thomasville Police Department. (DSMF ¶ 33.) Plaintiff wanted to leave work to get dinner, but before she could leave, she needed Slaughter to cover her assigned calls. (DSMF ¶¶ 34, 36.) For Slaughter to take calls from the Sheriff's Office, he had to transfer his fire department calls to Davis. (DSMF ¶ 38.)

3

Plaintiff, who was aware that Slaughter was watching a movie on his personal computer at the time,[2] asked Slaughter to take her calls. Slaughter had an earpiece for work calls in one ear, and an earpiece connected to his personal computer in the other ear. (DSMF ¶ 40.) The specific details of what follows are disputed. Both parties seem to agree that Plaintiff asked Slaughter to take her calls approximately five times, if not more. (DSMF ¶ 41, PSDMF ¶ 5.) Defendant claims that Slaughter did not respond to these requests (DSMF ¶ 41), though Plaintiff claims that Slaughter "turn[ed] to look in a direction to look at me", which she interpreted to mean that he "was possibly ignoring [her]." (PSDMF ¶ 5.) The sixth time that Plaintiff asked Slaughter to cover her calls, Slaughter responded by asking Davis to take Slaughter's call related to the fire department. (DSMF ¶ 43.) Davis responded that she would take the calls when she finished the call that she was handling. (DSMF ¶ 44.) After this exchange with Davis, Slaughter received a telephone call and took the call. (DSMF ¶ 47.)

When Slaughter hung up the telephone, Plaintiff approached him from his right side. (DSMF ¶ 49.) There is some dispute about whether Slaughter saw Plaintiff approaching. (DSMF ¶ 51, PSDMF ¶ 6.) Plaintiff reached over Slaughter's right side to reach for the mouse from his computer. (DSMF ¶ 53.) As she did so, Slaughter claims that he moved his right arm from the desk, making

---

[2] Watching movies during working hours was, at that time, permissible at E-911 as long as the movie watching occurred during a time when calls were slow. (DSMF ¶ 11.) For the record, Plaintiff notes that this practice is no longer allowed. (PSDMF ¶1.)

contact with the inside of Plaintiff's right arm. (DSMF ¶ 54, 55.) Plaintiff disagrees with Slaughter's characterization of his movement, and she claims that he "swung back with his fist" and "took his fist and knocked my arm out of the way." (PSDMF ¶ 7.) After Slaughter made contact with Plaintiff's arm, he turned his chair around to face Plaintiff. (DSMF ¶ 58.) Plaintiff used her left hand to grab Slaughter's headset. (DSMF ¶ 59.) As she reached to grab his headset, Plaintiff's fingernails or ring made contact with Slaughter's face, leaving a small mark. (DSMF ¶ 60.) The facts are in dispute as to what happened after this contact. Slaughter claims that he asked Plaintiff not to slap him again, and then the two engaged in a heated argument. (DSMF ¶ 61.) Plaintiff, on the other hand, claims that Slaughter "started coming towards me and [Davis] got between him – between where I was and him." (PSDMF ¶ 8.) Plaintiff claims that Slaughter came towards her with his fists clenched. Id.

Harper, who was the supervisor on duty, called and reported the incident to Powell, who instructed Harper to send both Plaintiff and Slaughter home. (DSMF ¶ 63.) Powell asked Harper to collect witness statements about the Incident from Slaughter, Davis, Plaintiff, and to write a statement herself. (DSMF ¶ 63, PSDMF ¶ 9.)

Powell later reviewed the written statements and recommended the termination of Plaintiff's employment with E-911. (DSMF ¶ 65.) On March 12, 2010, Powell gave Plaintiff an official recommendation of discharge. (DSMF ¶ 69.) In the recommendation, Powell alleged that Plaintiff engaged in conduct that:

5

(a) violated criminal laws; (b) was contrary to commonly established standards of ethics, honesty, or good morals; and (c) impaired or disrupted the orderly and efficient operation of the work unit. (DSMF ¶ 70.)

After receiving this recommendation from Powell, Plaintiff requested an appeal of Powell's recommendation. (DSMF ¶ 72.) Michael Stephenson, the county manager for Thomas County, conducted the appellate hearing on March 30, 2010. (DSMF ¶ 73; Deposition of Sheletha Foster, Doc. 24, p. 101.) Testimony was provided during the hearing from Plaintiff, Slaughter, Davis, Harper, and Powell. (DSMF ¶ 74.) On March 31, 2010, Stephenson issued a written opinion upholding Powell's recommendation and finding that Plaintiff's actions constituted "a disruption of the orderly and efficient operation of the work unit." (DSMF ¶ 75; Foster 105.) Plaintiff's employment with E-911 officially ended March 31, 2010. (Foster 106.)

Plaintiff now files this suit for discrimination under Title VII, alleging that the failure to transfer her to the day shift and her termination are both discriminatory actions that were taken against her based on her race.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). A genuine issue of material fact arises only when

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

When considering a motion for summary judgment, the court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 354-55. The court may not, however, make credibility determinations or weigh the evidence. Id. at 255; *see also* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323, 106 S.Ct. 2548 (internal quotation marks omitted). If the moving party meets this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the nonmoving party is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than mere conclusory allegations. *See* Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Under this framework, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an

7

element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

III. **ANALYSIS**

Title VII provides that an employer may not "discharge any individual … with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, [or] sex." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a prima facie case for discrimination under Title VII in one of two ways. First, she may present evidence of discrimination through direct evidence. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004). A claim based on direct evidence requires "the most blatant remarks, whose intent could mean nothing other than to discriminate." Id. (citing Rojas v. Florida, 28 F.3d 1339, 1342 n. 2 (11th Cir. 2002)). "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989). Second, where there is no direct evidence of discrimination, a plaintiff may show discrimination through circumstantial evidence. See Wilson, 376 F.3d at 1086.   Any evidence that merely suggests discrimination, but does not conclusively establish it, is considered circumstantial evidence. Id. In this case, Plaintiff makes no claims of direct discrimination, and therefore, she must rely on circumstantial evidence to prove her claim.

Without any direct evidence of discrimination, the Court must employ the three-step burden-shifting framework found in McDonnell Douglas Corp. v.

8

Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25 (1973). Under this framework, the plaintiff must first make out a prima facie case of discrimination. Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). Then the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the employment action. Id. If the employer is able to articulate a reason for the employment decision, the burden shifts back to the plaintiff to demonstrate that the employer's asserted reason is not the real reason for the employment decision and is instead mere pretext. Id. at 1024-25. These steps are examined below in greater detail.

A. **Plaintiff's Prima Facie Case**

To establish a prima facie case of Title VII discrimination, a plaintiff must show that "(1) that she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated [white] employees more favorably; and (4) she was qualified for the job." McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008). In this case, the first and fourth prongs of the prima facie case are not in dispute. However, the second and third prongs are contested.

Plaintiff alleges that she suffered two adverse actions. First, Plaintiff claims that she was transferred to a team which required her to work the night shift for a longer period of time than she anticipated or planned. Second, Plaintiff contends that she was terminated based on discrimination. Plaintiff also alleges that for each of these adverse actions, there was a similarly-situated, non-minority

9

employee who was treated differently than Plaintiff. The Court examines these allegations below.

    1. **Transfer**

Plaintiff claims that she suffered discrimination because she was transferred to a team that required her to work four additional months on the night shift when she anticipated working the day shift during that time. She argues that Kasey Sharpe, a white female, was allowed to stay on the day shift while she was forced to stay on the night shift against her wishes. Defendant contends that Plaintiff's schedule change does not amount to an adverse employment action.

Citing case law from the Middle District of Georgia, Defendant argues that an employee must show "a serious and material change in the terms, conditions, or privileges of employment" for an action to be considered adverse. *See* Coley v. Fortson-Peek Co., 4:10-cv-65 (CDL), 2011 WL 4899752, at * 7 (M.D. Ga. Oct. 14, 2011) (quoting Grimsley v. Marshalls of MA, Inc., 284 Fed. App'x 604, 608 (11th Cir. 2008)). Defendant contends that an amendment to a work schedule, cannot meet the standard for being a "serious and material change."

Defendant articulates the proper standard for an adverse employment action under Title VII. To prove an adverse employment action, an employee must show "a serious and material change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis omitted).  "Moreover, the employee's subjective view of the

circumstances and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Id. However, not all conduct by an employer that negatively affects an employee is sufficient to be an adverse action. Id. at 1238. While an adverse employment action need not result in a decrease in pay, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." Id. at 1239.

Plaintiff cites several cases arguing for a broader standard for adverse actions than the "serious and material change" standard. (Doc. 34, p. 10, n. 4.) However, the cases she cites are distinguishable because they are in the context of a retaliation case, not a discrimination case. The Supreme Court of the United States broadened the standard for adverse action in retaliation claims in Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405 (2006). However, the holding in Burlington has been specifically limited to retaliation cases only by the Eleventh Circuit. In DaCosta v. Birmingham Water Works & Sewer Bd., the Eleventh Circuit noted that "the broader view of adverse employment actions taken by the Supreme Court in Burlington v. & Santa Fe Ry. Co. appears limited to retaliation cases and does not alter this court's precedent in discrimination actions." 256 Fed. App'x. 283, 288 n. 6 (11th Cir. 2007). The court went on to affirm that the appropriate standard for discrimination claims was the "serious and material change" standard. Thus, for purposes of proving

an adverse action, this Court under Eleventh Circuit law is required to apply the "serious and material change" standard.

Under the "serious and material change" standard, the decision not to promote or transfer an employee based on the employee's subjective preference is generally not regarded as an adverse action, absent some evidence that the employee suffered a material loss of pay, prestige, or other quantifiable benefit. *See* Barnhart v. Wal-Mart Stores, Inc., 206 Fed. App'x. 890, 893 (11th Cir. 2006) (denial of lateral transfer to another position does not constitute an adverse action); Benningfield v. City of Houston, 157 F.3d 369, 377 (5th Cir. 1998) (determining that a transfer to the night shift, without more, did not constitute an adverse action); Richardson v. Jackson, 545 F. Supp. 2d 1318, 1328 (N.D. Ga. 2008) (finding that the denial of plaintiff's transfer request was not sufficient to show an adverse action because plaintiff could not show any other loss of benefit); Defrance v. CompuCredit Corp., 2007 WL 4373593 at * 14 (N.D. Ga. Dec. 5, 2007) (finding that "a refusal to transfer a plaintiff into a lateral position that does not result in a change in position, title, salary or other employment benefit is not considered adverse").

Though not controlling, the Court finds McGowan v. City of Eufala, 472 F.3d 736 (10th Cir. 2006), instructive. In that case, the Tenth Circuit discussed whether the failure to move an employee from the night shift was an adverse action. The court concluded that it was not an adverse action because the employee was unable to articulate any specific rationale, aside from subjective

preference, for why she wanted to change shifts. Id. at 742-43. Additionally, the court noted that her stated desire for change was for purely personal reasons and that her work on the night shift was not permanent. Id. at 743. The court determined that because there was no difference in pay or benefits, nor was there any indication that the work on the night shift was more arduous, that the denial to work the day shift instead of the night shift was not an adverse action. Id.

Similarly, in this case, the Court finds that Plaintiff has not shown that her continued work for four additional months on the night shift was an adverse action. While it is true that Plaintiff's schedule usually alternated between days and nights every four months (PSMF ¶ 2; Foster 46-47, 127), the Court finds that an additional four months on the night shift does not constitute a "serious and material change" for several reasons. First, Plaintiff was aware when she began work that she was not guaranteed a permanent work schedule. (DSMF ¶ 14.) Moreover, she signed a document that provided that "I understand that my shifts may change as well as the personnel that I work with." Id. Second, there is no evidence of any change in Plaintiff's benefits, pay, or work load. Third, there were several people who were transferred to different shifts at the same time that Plaintiff was transferred as a result of the demotion of Waddell. (DSMF ¶ 20.) This demonstrates that the reassignment of shifts was not targeted specifically at Plaintiff to make her job assignment more strenuous or difficult.

While it may have been inconvenient to be on the night shift for an additional four months, the shift change simply does not rise to the level of a "serious and material change" in Plaintiff's terms of employment. Because Plaintiff was unable to establish that there was an adverse action, it is unnecessary to consider Plaintiff's allegations that Kasey Sharpe was treated more favorably. Plaintiff is unable to prove a prima facie case on her claim that she was discriminated against based on her shift change, and her claim for discrimination based on her transfer is dismissed.

### 2. **Termination**

As to Plaintiff's claims about discrimination based on her termination, the parties agree that termination is an adverse employment action, satisfying the second prong of the prima facie case. This leaves on the third prong, which requires a plaintiff to show that her employer treated similarly-situated employees outside her classification more favorably than herself. Coutu v. Martin Cty. Bd. of Cty. Commissioners, 47 F.3d 1068, 1073 (11th Cir. 1995).  In this case, Plaintiff alleges that Patrick Slaughter was treated more favorably. In response, Defendant contends that Slaughter is not a proper comparator for purposes of establishing a prima facie case.

To determine whether employees are similarly situated for purposes of establishing a prima facie case, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir.

1999). To properly evaluate comparator evidence, "the quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Id.

In McCann v. Tillman, 526 F.3d 1370 (11th Cir. 2008), the Eleventh Circuit analyzed a plaintiff's Title VII discrimination claim and applied the "nearly identical" standard for comparators. Id. at 1374. The Court adopted this standard over the objections of the plaintiff, who argued for a "similar" standard for comparators. In adopting the stricter "nearly identical" standard, the Eleventh Circuit recognized the difficulty faced by the plaintiff in meeting the standard, but stated that "we are bound by precedent to adhere to the 'nearly identical standard.'" Id. at 1374 n. 4. Thus, the "nearly identical" standard applies in the present case.

In this case, Plaintiff alleges that Patrick Slaughter is a proper comparator. Plaintiff claims that she and Slaughter held the same job (Affidavit of Ann Powell, Doc. 22, ¶¶ 11, 17), both worked in the job for four years (Foster 61), and both reported to the same supervisors (Powell Affidavit, ¶ 3, 17). Plaintiff further argues that she and Slaughter were both involved in the Incident.

Defendant, on the other hand, argues that Plaintiff and Slaughter are not proper comparators. Defendant attempts to distinguish the two employees based on their conduct during the Incident. Specifically, Defendant contends that Plaintiff's conduct was intentional and Slaughter's conduct was unintentional, and

that this distinction demonstrates that the two are not comparators. Defendant argues that "[i]f the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer, the employees are not similarly situated…." Lee v. Kansas City Southern Ry. Co., 574 F.3d 253 (5th Cir. 2009).

While it may be true that the actions of an employee can be reason to distinguish, the Court finds that the actions of the employees in this case do not justify any legal distinction for the purpose of comparator evidence. Defendant claims that Powell conducted an investigation after the Incident and determined that "Slaughter unintentionally made contact with Plaintiff's arm as a result of being startled." (Doc. 20, p. 12.) Powell also determined that "Plaintiff's conduct was intentional." Id. The Court finds that Defendant's attempt to distinguish between the two employees based on Powell's findings regarding their subjective intent is futile.

The Court finds that Plaintiff and Slaughter are proper comparators. Both employees held the same position for the same numbers of years and were involved in the same Incident. The subjective intent of each employee during the Incident cannot be determined based on record review alone. The question of intent is exactly why this case was filed – Plaintiff and Slaughter both claim that their intent was defensive. The issue boils down to a question of fact. The decision makers in this case, Powell and Stephenson, have both been accused of bias and the record does not reveal any objective reason to believe one

16

employee over the other. Thus, the Court finds that the intent of Plaintiff and Slaughter is not an appropriate trait on which to distinguish the two employees.

Defendant has not put forth sufficient evidence to disprove Plaintiff's contention that she and Slaughter are comparators. The Court finds this prong of the prima facie case to be established. Therefore, all four prongs of the prima facie case have been established as to Plaintiff's claim that she was terminated as a result of discrimination. Thus, the Court moves to the second step of its analysis.[3]

### B. **Legitimate Reasons for the Employment Decision**

Once the plaintiff has established a prima facie case, an inference is raised that she was the subject of intentional race discrimination and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1174 (11th Cir. 2010). This intermediate burden is "exceedingly light." Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997) (citing Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994)).

In this case, Powell gave three reasons for the termination of Plaintiff. Those reasons included: (1) Plaintiff's actions violated criminal laws; (2) Plaintiff's

---

[3] In her response brief, Plaintiff makes the argument that even if no comparator evidence is shown, a plaintiff can carry her burden at the prima facie stage by showing other circumstantial evidence of discrimination. The Court acknowledges the argument, but finds it unnecessary to make any judicial determination on those grounds. Plaintiff has been able to establish a comparator, and thus, her argument about circumstantial evidence is moot.

actions were contrary to commonly established standards of ethics, honesty, or good morals; and (3) Plaintiff's actions impaired or disrupted the orderly and efficient operation of the work unit. (Doc. 20, p. 13.) Stephenson, who conducted a hearing based on Plaintiff's appeal of Powell's decision, concluded that Plaintiff's actions "constituted a disruption of the orderly and efficient operation of the work unit." (Doc. 20, p. 14.)

The reasons stated by Powell and Stephenson in support of Plaintiff's termination are sufficient to meet the second step of the burden-shifting analysis under McDonnell Douglas. These are legitimate reasons for termination.

### C. **Pretext**

If the employer produces evidence of a legitimate, nondiscriminatory reason for the adverse action, a plaintiff is afforded an opportunity to show that the employer's stated reason is a pretext for discrimination. Kragor v. Takeda Pharmaceuticals America, Inc., 702 F.3d 1304, 1308 (11th Cir. 2012). The plaintiff can show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 120 S. Ct. 2097 (1981)). "In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the

reasons given by the employer were not the real reasons for the adverse employment decision." Id. at 1308-09 (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)). If a plaintiff is able to produce evidence that the employer's proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer. Id. at 1309.

In this case, Plaintiff alleges that Defendant's proffered motives for her termination are pretext for two reasons. First, Plaintiff alleges that Powell's investigation was fraught with bias. Second, Plaintiff contends that Stephenson, the ultimate decision maker, was also biased.

First, Plaintiff contends that Powell harbors a discriminatory animus, meaning that her investigative findings are tainted with bias and are used as pretext for discrimination. In response to Plaintiff's claim, Defendant attempts to reinforce Powell's investigation by arguing that it was based on a complete and thorough review of statements submitted by witnesses to the Incident.[4] (Doc. 36, p. 3.) Defendant claims that an unbiased review of these statements makes apparent that Plaintiff was the aggressor, and therefore, Powell's decision to recommend Plaintiff's termination was not based on discriminatory motives. However, the Court finds that reading these statements is not a sufficient method to determine who acted as the aggressor. In her statement, Plaintiff claims that Slaughter "took his fist, knocked my arm out of the way." (Foster 66.) She later

---

[4] Powell did not conduct any in-person interviews after the Incident. (Powell 11.)

claimed that she was assaulted by Slaughter. (Foster 96.) On the other hand, in his statement, Slaughter claims that he acted defensively. (Deposition of Patrick Slaughter, Doc. 25, p. 34, where he states "I put my hand up kind of defensively…") There are no witnesses who saw the entire Incident unfold. (Foster 182; Slaughter 48.) Despite Powell's claim that she independently reviewed the statements, giving every statement "equal weight" (Powell 12), the Court finds that there is not sufficient evidence on the record to disprove Plaintiff's allegation of bias.

Second, Mike Stephenson, the County Manager who made the final decision to terminate Plaintiff, is accused of bias, and therefore, his review cannot serve to disprove Plaintiff's claim of discrimination. Plaintiff's allegations against Stephenson include a claim based on a "cat's paw" theory.[5] Under this theory, "causation may be established if the plaintiff shows that the decision maker followed the biased recommendation [of the employee] without independently investigating the complaint against the employee." Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999). "In such a case, the

---

[5] "The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no award." Staub v. Proctor Hosp., --- U.S. ---, 131 S.Ct. 1186, 1190 n. 1 (2011) (internal citations omitted).

recommender is using the decision maker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." Id. A plaintiff operating under a cat's paw theory must "prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee." Id. at 1331.

In this case, Plaintiff contends that Stephenson's ultimate decision to terminate her was heavily based on Powell's recommendation. Thus, Plaintiff contends that Stephenson acted as a "cat's paw" for Powell, carrying out her discriminatory animus. The evidence on the record shows that Powell did make a recommendation to Stephenson to fire Plaintiff (Powell 10), and there is no evidence to refute that Stephenson's determination was based heavily on her recommendation. Thus, the cat's paw theory cannot be disproven as a matter of law.

In this case, Plaintiff has presented sufficient evidence to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for her termination. Thus, her claim for discrimination based on her termination survives summary judgment.

IV.   **CONCLUSION**

In sum, summary judgment is granted in part and denied in part. Summary judgment is granted in favor of Defendant on Plaintiff's claim that she was discriminated against based on her transfer to a team that worked the night shift.

21

Summary judgment is denied on Plaintiff's claim that she was discriminated against as shown by the fact that she was terminated after the Incident with Slaughter. With issues of fact still remaining, this case shall be set for trial in April 2013.

  **SO ORDERED,** this 22nd day of February, 2013.


          ***s/ Hugh Lawson***
          HUGH LAWSON, SENIOR JUDGE

ebr